In the

# United States Court of Appeals
## for the Seventh Circuit

No. 24-2386

LEONIS AMANDA RIVAS-JARQUIN & C.A. C.-R.

*Petitioners*,

*v.*

PAMELA J. BONDI,
Attorney General of the United States,*

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A201-518-219 & A201-518-220

ARGUED JANUARY 17, 2025 — DECIDED AUGUST 11, 2025

Before SYKES, *Chief Judge*, and HAMILTON and PRYOR, *Circuit Judges*.

SYKES, *Chief Judge*. In October 2018 Leonis Amanda Rivas-Jarquin and her minor son left their home country of Nicaragua, fleeing reprisals by the Sandinista government in the

---

* Pamela J. Bondi replaced Merrick B. Garland as Attorney General and is substituted as the respondent. *See* FED. R. APP. P. 43(c)(2).

wake of anti-government protests that erupted earlier that
year. Rivas and her son entered the United States illegally in
November, and immigration authorities soon initiated re-
moval proceedings. Conceding removability, Rivas applied
for asylum, withholding of removal, and protection under the
Convention Against Torture, and listed her son as a deriva-
tive beneficiary on her application.[1] She based her claims on
her opposition to Nicaragua's governing party, the Frente
Sandinista de Liberación Nacional.

Rivas presented evidence of the generally repressive na-
ture of the Sandinista regime and testified about her life in
Nicaragua. In brief, she told the judge that she worked at her
family's pharmacy, and when the protests broke out in the
spring and summer of 2018, she provided money and medi-
cine to protesters. Because of this support, she fears state-
sponsored retribution if she returns to Nicaragua.

An immigration judge found Rivas credible but concluded
that she had not established a well-founded fear of future per-
secution or a likelihood of torture and therefore denied her
applications for relief. The Board of Immigration Appeals up-
held those determinations. Because the agency's decision is
supported by substantial evidence, we deny Rivas's petition
for review.

## I. Background

Leonis Amanda Rivas-Jarquin, a native and citizen of Nic-
aragua, illegally entered the United States with her 11-year-
old son in November 2018. Removal proceedings commenced

---

[1] We refer to the petitioner as Rivas rather than Rivas-Jarquin, consistent
with her briefs.

a few months later. Rivas conceded removability but applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), asserting that she could not return to Nicaragua without facing persecution and torture by the Sandinistas. She included her son as a derivative beneficiary on her application.

At a hearing before an immigration judge, Rivas testified about her life in Nicaragua. She explained that she and her son lived in Managua with her mother, her brother, and a woman named Janet Ramirez. The family operated a home-based pharmacy: Rivas's mother owned the business, Rivas helped the customers, and Ramirez managed the regulated medicines. Starting in April 2018, opponents of the Sandinista regime staged anti-government marches and protests, and the protest activity stretched into the summer.

Rivas provided indirect support to the opposition movement by giving small but repeated amounts of money, medicine, and supplies to people associated with the protests—including a local doctor, the families of injured protesters, and a pastor who distributed funds to protesters in need of medical treatment. Like many of the protesters, Rivas supports the Partido Liberal Constitucionalista ("PLC") because it opposes the Sandinistas. But she has never formally joined the PLC, nor has she donated money directly to the party or participated in any political protests on its behalf.

Rivas was never physically harmed or threatened in Nicaragua, but a shooting occurred in the summer of 2018 that left bullet marks on the family's home-based pharmacy. Rivas does not know who was responsible for the shooting, but she believes that it could have been individuals linked to the government.

Fearing repression and social upheaval, Rivas left Nicaragua with her son in October 2018. Since her departure people associated with the government have come to the pharmacy and asked about her brother (who was actively involved in the protests) and Ramirez—but not Rivas. Some of the pharmacy's customers inquired about her whereabouts; Rivas admitted, however, that no evidence connected these people to the Sandinistas. Her mother, an active member of the PLC, remained in Nicaragua and continued to manage the pharmacy and distribute medicine to regime opponents without facing persecution. Ramirez also stayed at the pharmacy until she fell ill and returned to her family's home in 2020.

The immigration judge found Rivas credible but denied her applications for asylum and withholding of removal. The judge determined that there was no evidence of past persecution and that Rivas's fear of future persecution was not objectively reasonable. The judge also concluded that Rivas had not established a future likelihood of torture and thus denied her application for protection under the CAT.

The Board of Immigration Appeals upheld the immigration judge's decision, reasoning that Rivas's evidence of generalized violence in Nicaragua was insufficient to support her claims for relief. Rivas timely petitioned for review of the agency's decision.

## II. Discussion

Rivas challenges the Board's determination that she did not meet her burden of proving future persecution or a likelihood of torture if returned to Nicaragua. Because the Board affirmed the immigration judge's analysis while adding some of its own, "we review the judge's reasoning as supplemented

by the Board's." *Gulomjonov v. Bondi*, 131 F.4th 601, 612 (7th Cir. 2025). We review "under the highly deferential substantial evidence test," reversing "only if we determine that the evidence *compels* a different result." *Dai v. Garland*, 24 F.4th 628, 634 (7th Cir. 2022) (internal quotation marks omitted).

## A. Asylum and Withholding of Removal

Eligibility for asylum turns on whether the applicant is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is one who demonstrates that he is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

The Immigration and Nationality Act and its implementing regulations do not define "persecution." Our cases hold that the term includes, but is not limited to, "life-threatening or freedom-threatening" conduct. *N.Y.C.C. v. Barr*, 930 F.3d 884, 888 (7th Cir. 2019) (internal quotation marks omitted). We've explained that persecution involves "the use of *significant* physical force …, or the infliction of comparable physical harm without direct application of force …, or nonphysical harm of equal gravity." *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). Persecution can also involve "a credible threat to inflict grave physical harm." *Id.* But threats that are "too vague and never materialized into a more acute and substantial risk" do not amount to persecution. *N.Y.C.C.*, 930 F.3d at 889. And mere harassment likewise does not qualify. *Id.* at 888.

Rivas concedes that she did not suffer past persecution, so it was her burden to prove that her claimed fear of future

persecution is both subjectively genuine and objectively rea-
sonable. *Li Ying Zheng v. Holder*, 722 F.3d 986, 990 (7th Cir.
2013). To demonstrate an objectively reasonable fear of future
persecution, Rivas had to establish "a reasonable possibility"
that she will "be singled out individually for persecution" or
that there is "a pattern or practice" in her home country of
persecution against a group to which she belongs. *Granados
Arias v. Garland*, 69 F.4th 454, 463 (7th Cir. 2023) (quoting 8
C.F.R. § 1208.13(b)(2)(iii)).

Rivas has not argued that she will be singled out for per-
secution; indeed, she does not claim that anyone associated
with the Sandinistas is aware of her assistance to PLC sup-
porters. She instead relies on a pattern-or-practice theory to
support her asylum claim.

To prevail on a pattern-or-practice claim, an asylum appli-
cant must show that there is "a systematic, pervasive, or or-
ganized effort" to persecute members of the protected group,
and this effort must be "perpetrated or tolerated by state ac-
tors." *Gulomjonov*, 131 F.4th at 612 (quoting *Krishnapillai v.
Holder*, 563 F.3d 606, 620 (7th Cir. 2009)). This requires an "ex-
treme level of persecution." *Halim v. Holder*, 755 F.3d 506, 512
(7th Cir. 2014). "The standard is high because once the court
finds that a group was subject to a pattern or practice of per-
secution, every member of the group is eligible for asylum."
*Ahmed v. Gonzales*, 467 F.3d 669, 675 (7th Cir. 2006).

Rivas proposes the following two social groups in support
of her pattern-or-practice claim: professionals who provided
healthcare to protestors, or far more generally, opponents of
the Sandinistas. To establish that similarly situated members
of these groups have faced persecution, she relies on reports
and articles documenting the social unrest and upheaval that

erupted in Nicaragua in 2018. *See, e.g.*, BUREAU OF DEMOCRACY, HUM. RTS. & LAB., U.S. DEP'T OF STATE, NICARAGUA 2019 HUMAN RIGHTS REPORT (Mar. 11, 2020); Frances Robles, *Nicaragua Has a Simple Message for Protesters: Don't*, N.Y. TIMES (Dec. 26, 2019), https://www.ny-times.com/2019/12/26/world/americas/nicaragua-ortega-pro-tests.html. She argues that the Board failed to appreciate the breadth and gravity of the persecution evidenced by these reports.

We begin with the group of professionals who provided healthcare to those injured during the crackdown against the 2018 protests. The Board acknowledged that the Sandinistas fired many medical professionals who treated wounded protesters and, on at least a few occasions, more seriously threatened healthcare workers. But the Board concluded that this evidence was insufficient to demonstrate persecution of the kind and severity required for an asylum claim. The record does not compel a contrary conclusion. Although the reports describe the experiences of some medical professionals who faced intimidation, harassment, and (occasionally) death threats, these accounts do not provide the proof of widespread persecution required to disturb the Board's decision. *See Pathmakanthan v. Holder*, 612 F.3d 618, 625 (7th Cir. 2010) (describing the high standard set for anecdotal evidence to support a pattern-or-practice claim).

The remaining proposed social group—opponents of the Sandinistas—is described at such a high level of generality that it includes large swaths of the Nicaraguan population. Proposing a very broadly defined social group does not necessarily doom the claim, *Orellana-Arias v. Sessions*, 865 F.3d 476, 484 n.2 (7th Cir. 2017), but it does, as a practical matter,

make it harder to establish systematic, pervasive, and organized persecution. That is true in part because evidence of generalized violence is, without more, insufficient to prove a well-founded fear of persecution. *Granados Arias*, 69 F.4th at 464; *see also Hernandez-Garcia v. Barr*, 930 F.3d 915, 920–21 (7th Cir. 2019) (holding that "general conditions" of violence and unrest "do not alone suffice" to show that a fear is objectively reasonable). Even when civil strife within a country causes "substantial hardships" for a protected group, it "does not automatically" mean that every member of that group is "a subject of persecution." *Krishnapillai*, 563 F.3d at 620. We do not minimize the Sandinista's repression of open opposition or even peaceful protest, but the evidence does not compel us to conclude that passive dissenters like Rivas—who have neither participated in the protests nor joined the opposition party— face systemic future persecution.

The Board also emphasized that Rivas's mother, an active PLC member who has supported the anti-Sandinista protesters, remained in Nicaragua unharmed after her daughter and grandson left. This fact undercuts Rivas's argument that she faces a reasonable possibility of persecution upon her return. *See Guardia v. Mukasey*, 526 F.3d 968, 972 (7th Cir. 2008) ("Evidence that an applicant's family members remain unharmed in their home country may support a finding that the applicant is unlikely to suffer future persecution.").

Rivas resists this conclusion by recounting the shooting that took place outside her family's home; she argues that her mother was safe only because she paid for nightly surveillance. But Rivas admitted at her immigration hearing that she does not know who was responsible for the shooting, and the suggestion that her mother would not be safe if she did not

pay for security is wholly speculative. Substantial evidence supports the agency's denial of Rivas's asylum application.

As for withholding of removal, Rivas must establish a "clear probability"—meaning it is "more likely than not"—that she will suffer persecution upon removal. *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 827 (7th Cir. 2016). This is a greater burden than the "reasonable possibility" standard for asylum, which does not require showing "that persecution is definite or even likely." *Ayele v. Holder*, 564 F.3d 862, 868 (7th Cir. 2009). It follows that failing to prove persecution for asylum purposes necessarily means Rivas cannot meet the higher standard for withholding of removal. *N.Y.C.C.*, 930 F.3d at 890.

## B. CAT Relief

To be eligible for protection under the Convention Against Torture, an applicant must demonstrate that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Lozano-Zuniga*, 832 F.3d at 830 (internal quotation marks omitted). "'Torture' is defined as 'severe pain or suffering' or an 'extreme form of cruel and inhuman treatment' that is intentionally inflicted with the consent or acquiescence of a public official." *Meraz-Saucedo v. Rosen*, 986 F.3d 676, 686 (7th Cir. 2021) (quoting 8 C.F.R. § 208.18(a)(1)–(2)). While evidence of similarly situated individuals having suffered torture is not irrelevant to a CAT claim, *Molina-Avila v. Sessions*, 907 F.3d 977, 982 (7th Cir. 2018), an applicant "must show that he personally faces a substantial risk of torture," *Mabuneza v. Garland*, 16 F.4th 1222, 1227 (7th Cir. 2021). This standard imposes a higher burden than the one required to demonstrate a clear probability of

future persecution for purposes of a withholding claim. *Gulomjonov*, 131 F.4th at 613.

Rivas asserts that she is entitled to protection under the torture treaty for the same reasons and based on the same evidence as her petitions for asylum and withholding of removal. But her failure to establish those claims necessarily means she cannot prevail under the higher standard required for this alternative form of relief. Substantial evidence supports the Board's denial of the CAT claim.

PETITION DENIED